**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF NORTH CAROLINA**
**CHARLOTTE DIVISION**
**3:14-cv-159-RJC**
**(3:06-cr-151-RJC-1)**

| | | |
|---|---|---|
| **GUISEPPE PILEGGI,** | ) | |
| | ) | |
| **Petitioner,** | ) | |
| | ) | |
| **vs.** | ) | **ORDER** |
| | ) | |
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| **Respondent.** | ) | |
| ———————————————————— | ) | |

   **THIS MATTER** is before the Court on Petitioner's Motion to Vacate, Set Aside or Correct

Sentence under 28 U.S.C. § 2255, (Doc. No. 1).

  **I.**   **BACKGROUND**

   Petitioner was charged along with thirteen co-defendants in a fraudulent sweepstakes call-

center scheme run out of Costa Rica, targeting United States citizens. Petitioner, a Canadian

citizen, was alleged to have owned and managed one or more of the call centers. Petitioner was

charged with one count of conspiracy in violation of 18 U.S.C. §§ 371 and 2326(2)(A) and (B)

(Count 1), and 22 counts of wire fraud in violation of 18 U.S.C. §§ 1343, 2326(2)(A) & (B) and

(2) (Counts 2-23); (Crim. Case No. 3:06-cr-151-RJC, Doc. No. 113: Superseding Indictment).

The indictment included a notice of forfeiture. (Id., Doc. No. 113 at 18).

   The case proceeded to a four-day jury trial before the Honorable Frank D. Whitney in

January, 2008. The Government presented evidence that the United States Postal Service engaged

in a large-scale sweepstakes fraud investigation with the assistance of the Costa Rican

Government. Costa Rican law enforcement conducted surveillance of several individuals

1

including the Petitioner, and executed a search of sixteen sites simultaneously on May 16, 2006, pursuant to Letters Rogatory submitted by the U.S. Government. The search locations included Tico Racer (an auto accessory store that Petitioner owned with co-conspirator Herman Kankrini), Petitioner's home, and several call centers from which the sweepstakes fraud was being conducted. A Costa Rican law enforcement agent testified that he arrested Petitioner outside the Tico Racer store at around 8:30 AM and seized the red and black thumb drive he was wearing around his neck. Costa Rican agents also seized a number of computers, another thumb drive from the call center a Rohmoser, and other digital evidence during the search. They seized a computer, records, and $238,000 in cash from Petitioner's home. Agents seized a number of documents from Kankrini's car including handwritten notebooks full of his and Petitioner's handwriting that document victims' losses in the sweepstakes scheme. Costa Rican authorities summarized the seized evidence in an "Acta" for each location, and United States Postal Inspector Jose Gonzalez personally transported the evidence to the United States under secure conditions. Inspector Gonzalez testified that a computer expert from his office, Dan Dorman, then copied the digital information so that the originals would not be damaged. The records, which were introduced at trial, included scripts for defrauding victims, hundreds of victims' personal information, notes regarding the amounts in which the victims had been defrauded, details about the money they victims wired or transmitted via bank accounts, and plans to further defraud various victims. Several fraud victims who were not specifically charged in the indictment testified that they received phone calls informing them of sweepstakes winnings and requiring payment for items such as taxes, customs, courier fees and/or insurance, which they paid, and for which they never received any winnings. One victim, Frank Pytel, who is elderly and infirm, lost more than $800,000 in the scheme. Three of Petitioner's co-conspirators, Victor Kustra, Herman Kankrini, and Larry

Cunningham, testified that Petitioner owned various call centers over the years from which he conducted the sweepstakes fraud, that he was actively engaged in the fraud, that he personally profited from each of the victims' losses, and that no legitimate business was conducted from any of his call centers. Trent Nyffler, who pled guilty to conspiracy, testified that he sold lists of personal information for individuals that Petitioner victimized in the sweepstakes scheme for three or four years.[1]

Petitioner testified at trial against counsel's advice. His decision to testify prompted counsel to move to withdraw from the representation, which the Court denied, and to request that Petitioner be permitted to testify in the narrative, which the Court granted. Petitioner testified that the Government's witnesses were lying about the timing and circumstances of his arrest, that the information gleaned from his thumb drive and computer had been tampered with, that he knew Kankrini was involved in something illegal that Petitioner failed to report to authorities, that the $238,000 found in his home was Kankrini's, that he paid for his home and cars through unreported profits from Tico Racer and its associated magazine, and that he was never engaged in a sweepstakes fraud scheme.

The jury found Petitioner guilty of all twenty-three counts with which he was charged, as well as forfeiture in the amount of that $8,381,962 was derived from proceeds that Petitioner obtained, directly or indirectly, as the result of the conspiracy, and that $32,761 was derived from proceeds that Petitioner obtained, directly or indirectly, as a result of the scheme to commit wire fraud. (Id., Doc. No. 246-47).

The PSR calculated the base offense level as seven because the offense involves a violation of 18 U.S.C. §§ 371, 1343, 1341, 2314 and 506(a)(2). (Id., Doc. No. 326 at ¶ 40). Thirty levels

---

[1] On rebuttal, Nyffeler identified Petitioner's voice as that of "Robert Hailey" with whom he had spoken on the phone on more than 100 occasions. (Id. Doc. No. 412 at 101-03).

were added for the following specific offense characteristics: known or reasonably foreseeable loss amount over $7,000,000 (20 levels); more than 250 victims (six levels); misrepresentation that the Petitioner and others were acting on behalf of a government agency (two levels); a substantial part of the scheme was committed outside the United States (two levels). (Id., Doc. No. 326 at ¶¶ 410-44). Two levels were added because Petitioner knew or should have known that the majority of the victims were elderly or otherwise particularly susceptible to criminal conduct, four levels were added because Petitioner was an organizer or leader in a criminal activity involving at least five participants. (Id., Doc. No. 326 at ¶¶ 45-47). Another two levels were added for obstruction of justice because Petitioner perjured himself at trial. (Id., Doc. No. 326 at ¶¶ 30-35, 45). He received no adjustment for acceptance of responsibility. (Id., Doc. No. 326 at ¶ 50). The total offense level was forty-three. (Id., Doc. No. 326 at ¶ 51). Petitioner had no criminal history points and a criminal history category of I. (Id., Doc. No. 326 at ¶ 54). The resulting guideline range is life imprisonment, up to five years of supervised release, fines between $25,000 and $250,000, and restitution. (Id., Doc. No. 326 at ¶¶ 71, 74, 79, 82).

The Government moved to dismiss Count 18 at the sentencing hearing, which was granted. (Id., Doc. No. 487 at 3). The Court sentenced Petitioner to a total of 600 months' imprisonment followed by three years of supervised release, imposed $3,952,985 in restitution, and entered a final Order of forfeiture in accordance with the jury's verdict. (Id., Doc. No. 357, 424).

On direct appeal, Petitioner argued that his sentence amounted to a life sentence in violation of the United States' extradition agreement with Costa Rica, and exceeded the statutory maximum for each count, which constituted cruel and unusual punishment. (4th Cir. Case No. 08-4237, Doc. No. 50 at 20). The Fourth Circuit agreed that the sentence was based on clearly erroneous facts,

thus making Petitioner's 600-month sentence procedurally unreasonable. It remanded for resentencing before a different judge. United States v. Pileggi, 361 Fed. Appx. 475 (4th Cir. 2010).

The case was reassigned to the undersigned on remand, and Petitioner was resentenced to a total of 300 months' imprisonment (60 months as to Count 1 and 240 months each as to Counts 2-17 and 19-23 running concurrently with each other and consecutively to Count 1), and restitution in the amount of $20,726,005.18. (Crim. Case No. 3:06-cr-151-RJC, Doc. No. 595: Amended Judgment). On appeal, the Fourth Circuit held that the Court was barred from reconsidering the amount of restitution on remand and reinstated the previous restitution order. United States v. Pileggi, 703 F.3d 675 (4th Cir. 2013); see (Crim. Case No. 3:06-cr-151-RJC, Doc, No. 626: Amended Judgment).

Petitioner filed the instant motion to vacate pursuant to 28 U.S.C. § 2255 on March 31, 2014. (Doc. No. 1). He raises claims of ineffective trial and appellate counsel, trial court error, and prosecutorial misconduct. The Government has filed a response and Petitioner has replied. The § 2255 motion to vacate is ripe for disposition.

## II.    PROCEDURAL DEFAULT

"Habeas review is an extraordinary remedy and will not be allowed to do service for an appeal." Bousley v. United States, 523 U.S. 614, 621 (1998) (internal citations omitted); United States v. Sanders, 247 F.3d 139, 144 (4th Cir. 2001). In order to collaterally attack a conviction or sentence based upon errors that could have been but were not pursued on direct appeal, a petitioner must show cause and actual prejudice resulting from the errors of which he complains or he must demonstrate that a miscarriage of justice would result from the refusal of the court to entertain the collateral attack. See United States v. Frady, 456 U.S. 152, 167-68 (1982); United States v. Mikalajunas, 186 F.3d 490, 492–93 (4th Cir. 1999); United States v. Maybeck, 23 F.3d 888, 891-

92 (4th Cir. 1994). Actual prejudice is then shown by demonstrating that the error worked to petitioner's "actual and substantial disadvantage," rather than just creating a possibility of prejudice. See Satcher v. Pruett, 126 F.3d 561, 572 (4th Cir. 1997) (quoting Murray v. Carrier, 477 U.S. 478, 494 (1986)). To establish cause based upon ineffective assistance of counsel, a petitioner must show that the attorney's performance fell below an objective standard of reasonableness and that he suffered prejudice as a result. See Murray, 477 U.S. at 488; Strickland v. Washington, 466 U.S. 668, 687 (1984). In order to demonstrate that a miscarriage of justice would result from the refusal of the court to entertain the collateral attack, a petitioner must show actual innocence by clear and convincing evidence. See Murray, 477 U.S. at 496.

### III.     SECTION 2255 STANDARD OF REVIEW

The Sixth Amendment to the U.S. Constitution guarantees that in all criminal prosecutions, the accused has the right to the assistance of counsel for his defense. See U.S. Const. Amend. VI. To show ineffective assistance of counsel, Petitioner must first establish deficient performance by counsel and, second, that the deficient performance prejudiced him. See Strickland, 466 U.S. at 687-88. The deficiency prong turns on whether "counsel's representation fell below an objective standard of reasonableness ... under prevailing professional norms." Id. at 688. A reviewing court "must apply a 'strong presumption' that counsel's representation was within the 'wide range' of reasonable professional assistance." Harrington v. Richter, 562 U.S. 86, 104 (2011) (quoting Strickland, 466 U.S. at 689). The Strickland standard is difficult to satisfy in that the "Sixth Amendment guarantees reasonable competence, not perfect advocacy judged with the benefit of hindsight." See Yarborough v. Gentry, 540 U.S. 1, 8 (2003). The prejudice prong inquires into whether counsel's deficiency affected the judgment. See Strickland, 466 U.S. at 691. A petitioner must demonstrate "a reasonable probability that, but for counsel's unprofessional errors, the result

of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id. at 694. In considering the prejudice prong of the analysis, a court cannot grant relief solely because the outcome would have been different absent counsel's deficient performance, but rather, it "can only grant relief under . . . Strickland if the 'result of the proceeding was fundamentally unfair or unreliable.'" Sexton v. French, 163 F.3d 874, 882 (4th Cir. 1998) (quoting Lockhart v. Fretwell, 506 U.S. 364, 369 (1993)). Under these circumstances, the petitioner "bears the burden of affirmatively proving prejudice." Bowie v. Branker, 512 F.3d 112, 120 (4th Cir. 2008). If the petitioner fails to meet this burden, a "reviewing court need not even consider the performance prong." United States v. Rhynes, 196 F.3d 207, 232 (4th Cir. 1999), *vacated on other grounds*, 218 F.3d 310 (4th Cir. 2000).

The Sixth Amendment right to the assistance of counsel during criminal proceedings extends to the plea-bargaining process. See Missouri v. Frye, 566 U.S. 133 (2012). Thus, criminal defendants are "entitled to the effective assistance of competent counsel" during that process. Lafler v. Cooper, 566 U.S. 156, 162 (2012) (internal quotation marks omitted); Merzbacher v. Shearin, 706 F.3d 356, 363 (4th Cir. 2013). As a general rule, defense counsel has the duty to communicate formal offers from the prosecution to accept a plea on terms and conditions that may be favorable to the accused. Frye, 566 U.S. at 145. To show prejudice from ineffective assistance of counsel where a plea offer has lapsed or been rejected because of counsel's deficient performance, defendants must demonstrate a reasonable probability they would have accepted the earlier plea offer had they been afforded effective assistance of counsel, as well as a reasonable probability the plea would have been entered without the prosecution canceling it or the trial court refusing to accept it. Id. at 147. It is necessary to show a reasonable probability that the end result

of the criminal process would have been more favorable by reason of a plea to a lesser charge or a sentence of less prison time. Id.

Strickland also applies in the context of appellate representation. To show prejudice in such cases, a petitioner must show a "reasonable probability ... he would have prevailed on his appeal" but for his counsel's unreasonable failure to raise an issue. Smith v. Robbins, 528 U.S. 259, 285–86 (2000); see also United States v. Mannino, 212 F.3d 835, 845–46 (3d Cir. 2000) ("The test for prejudice under Strickland is not whether petitioners would likely prevail upon remand, but whether we would have likely reversed and ordered a remand had the issue been raised on direct appeal.").

Rule 4(b) of the Rules Governing Section 2255 Proceedings provides that courts are to promptly examine motions to vacate, along with "any attached exhibits and the record of prior proceedings . . ." in order to determine whether the petitioner is entitled to any relief on the claims set forth therein. After examining the record in this matter, the Court finds that the arguments presented by Petitioner can be resolved without an evidentiary hearing based on the record and governing case law. See Raines v. United States, 423 F.2d 526, 529 (4th Cir. 1970).

## IV. DISCUSSION

### A. Claims of Trial Court Error and Prosecutorial Misconduct.

The Respondent asserts that many of Petitioner's claims are procedurally defaulted from § 2255 review.

Petitioner's claims of prosecutorial misconduct and trial court error could have been, but were not, raised on direct appeal. Therefore these claims are procedurally defaulted from § 2255 review absent a showing of cause and prejudice or actual innocence. Petitioner concedes in his §

2255 motion to vacate that none of his claims had been raised previously because "the grounds necessarily involve operative facts unavailable at the time of direct appeal." (Doc. No. 1 at 10).

Petitioner's suggestion that his claims of prosecutorial misconduct and trial court error could not have been raised earlier because they are based on newly discovered facts is rejected. Petitioner was present at the entire trial and sentencing proceedings and was therefore well aware of the factual basis of these claims. The fact that he might not have appreciated their legal significance until later does not excuse his failure to raise them in the district court and/or on direct appeal. See Rose v. Lee, 252 F.3d 676, 687 (4th Cir. 2001) ("a petitioner cannot establish cause when the facts underlying the claim were in existence upon a reasonably diligent search."); United States v. Pettiford, 612 F.3d 270, 281 (4th Cir. 2010) (§ 2255 relief was unavailable where the facts underlying petitioner's challenges to his prior convictions were available at sentencing).

In his Reply, Petitioner argues for the first time that his procedurally defaulted claims are excused by ineffective assistance of trial and appellate counsel, and because they are violations of due process.[2] (Doc. No. 13 at 15).

As a preliminary matter, there is no general procedural default exception for claims of due process violations. See generally Bousley, 523 U.S. at 621 (challenge to the voluntariness of a guilty plea is procedurally defaulted if it is not raised on direct appeal); Peveler v. United States, 269 F.3d 693 (6th Cir. 2001) (due process claim is procedurally defaulted if it is not raised on direct appeal or excused by a showing of cause and prejudice or actual innocence); Guyton v. United States, 447 Fed. Appx. 136 (11th Cir. 2011) (same); United States v. Aguilar-Ortiz, 86 Fed. Appx. 390 (10th Cir. 2004) (same).

---

[2] Petitioner does not assert actual innocence.

When using ineffective assistance of counsel to excuse procedural default of another independent claim, counsel must have been so wholly deficient as to violate Petitioner's Sixth Amendment right. Edwards v. Carpenter, 529 U.S. 446, 451 (2000) (citing Murray, 477 U.S. at 488–89). Thus, Petitioner must show that by failing to challenge these issues, counsel's performance fell below an objective standard of reasonableness, and that he was prejudiced by such constitutionally deficient representation. Strickland, 466 U.S. at 668. The Supreme Court has explained that while ineffective assistance of counsel may establish cause for a procedural default, "the mere fact that counsel failed to recognize the factual or legal basis for a claim, or failed to raise the claim despite recognizing it, does not constitute cause for a procedural default." Murray, 477 U.S. at 486.

Petitioner's assertion that his procedurally defaulted claims were not raised at trial or on appeal because of counsel's deficient performance falls short of establishing "cause" for his procedural default. See Fakih v. United States, 2011 WL 4402763 at *2 (W.D.N.C. Sept. 21, 2011) (petitioner's blanket conclusory assertion as to his procedurally defaulted claims that such claims were not raised on appeal because of "appeal counsel deficient performance" falls short of establishing "cause" for his procedural default). Neither trial nor appellate counsel was objectively unreasonable for failing to raise these claims because they are meritless for the reasons that follow, and therefore, ineffective assistance of counsel does not excuse his procedural default of these claims and they are dismissed.

(1)      Petitioner claims that the Government engaged in misconduct by: (a) knowingly presenting and failing to correct false testimony at trial; (b) presenting improperly seized evidence at trial; (c) presenting altered or adulterated computer data while ensuring the computer expert was

unavailable to testify; (d) unfairly commenting on Petitioner's guilt; and (e) commenting on Petitioner's silence.

(a)     First, Petitioner contends that the Government knowingly presented false testimony by failing to correct co-defendant Andreas Leimer's testimony which led to the search warrant and indictment. Further, the Government presented Inspector Gonzalez's testimony that the information Leimer provided to the Government was always truthful, whereas the Government knew that Leimer had been convicted of making false statements, thus rendering Gonzalez's testimony inaccurate.

"[A] State may not knowingly use false evidence, including false testimony, to obtain a tainted conviction." Napue v. Illinois, 360 U.S. 264, 269 (1959). "This is true regardless of whether the [g]overnment solicited testimony it knew or should have known to be false or simply allowed such testimony to pass uncorrected." United States v. Kelly, 35 F.3d 929, 933 (4th Cir. 1994). A new trial is required when the government's knowing use of false testimony could affect the judgment of the jury. See Giglio v. United States, 405 U.S. 150, 154 (1972). However, a new trial is not automatically required whenever a "combing of the prosecutors" files after the trial has disclosed evidence possibly useful to the defense but not likely to have changed the verdict. Id. (quoting United States v. Keogh, 391 F.2d 138, 148 (2d Cir. 1968)); United States v. Bartko, 728 F.3d 327, 335 (4th Cir. 2013).

To the extent that Petitioner claims that the Government knowingly presented or failed to correct Leimer's testimony is premised on an incorrect factual basis because Leimer did not testify at trial.  See Raines, 423 F.2d at 529 ("Where the files and records conclusively show that the prisoner is entitled to no relief, summary dismissal is appropriate.").

Petitioner's claim that the Government knowingly presented Leimer's false statements via Inspector Gonzalez's testimony, is based on incorrect factual allegations and is meritless.

Inspector Gonzalez testified at trial that he interviewed Leimer pursuant to a subpoena in November, 2005. The prosecutor asked whether Gonzalez "obtain[e]d any information that furthered [his] sweepstakes investigation from Mr. Leimer," and Gonzalez responded "[y]es, sir, I did." (Id., Doc. No. 402 at 33). Defense counsel objected when the prosecutor asked Gonzalez to summarize the information gained from Leimer, and the Court ruled that the witness could explain why he took certain steps in the investigation. (Id., Doc. No. 402 at 34). Gonzalez went on to testify that Leimer acknowledged he owned two Vonage phone number boxes that were associated with the sweepstakes fraud and installed them in Costa Rica. (Id., Doc. No. 402 at 34).

On cross-examination, Gonzalez testified that Leimer was charged as a co-conspirator in this investigation and he is a fugitive somewhere in Costa Rica or Central America. (Id., Doc. No. 402 at 171). Gonzalez then testified that Leimer initially cooperated with the investigation and law enforcement was able to corroborate the information he provided. (Id., Doc. No. 402 at 171-72). However, Leimer was charged with making false statements after he testified before the grand jury. (Id., Doc. No. 411 at 134).

Petitioner has failed to show that Gonzalez's testimony based on the information Leimer initially provided during the investigation, was false, or that the Government knew of its falsity. Moreover, the issue of Leimer's credibility was before the jury regarding his perjury charge, and therefore, his veracity was before the jury for consideration.

(b) Next, Petitioner complains that the Government introduced at trial evidence that was improperly shipped to the United States before Petitioner was extradited. Further, items seized

from the Tico Racer call center were outside the ambit of discovery, and a thumb drive was improperly seized.

As a preliminary matter, to the extent that Petitioner suggests any evidence should have been suppressed under the Fourth Amendment's exclusionary rule, this argument fails because he is a Canadian citizen who was arrested, and whose property was seized, in Costa Rica. The Fourth Amendment has no application under these circumstances. See United States v. Verdugo-Urquidez, 494 U.S. 259, 261 (1990). Therefore, any restrictions on the search and seizure in Costa Rica "must be imposed by the political branches through diplomatic understanding, treaty, or legislation." Id. at 275.

To the extent Petitioner seeks relief in the instant case pursuant to the United States' Extradition Treaty with Costa Rica, and assuming that Petitioner has standing to raise the issue,[3] this claim fails.

Petitioner's arguments that the search of the Tico Racer location somehow exceeded the scope of the permissible search, and that a thumb drive was improperly seized, are refuted by the record. Inspector Gonzalez testified that he submitted Letters Rogatory to the Costa Rican government requesting intelligence information, surveillance, search warrants, bank records, and business documents regarding several individuals including Petitioner. (Id., Doc. No. 402 at 33). The Costa Rican judiciary approved the Letters Rogatory and assigned the matter to the fraud section of their Department of Justice. (Id., Doc. No. 402 at 35-36). Costa Rican law enforcement executed a search pursuant to the Letters Rogatory on sixteen different sites on May 16, 2006, including Petitioner's Tico Racer business, and a call center at Rohmoser. (Id., Doc. No. 402 at

---

[3] The Fourth Circuit has not yet ruled on whether an individual defendant has standing to raise purported violation of an extradition treaty. United States v. Day, 700 F.3d 713, 721–22 (4th Cir. 2012); United States v. Davis, 954 F.2d 182, 186 (4th Cir.1992).

41-42). Inspector Gonzalez further testified that items including thumb drives were seized from the various sites on May 16, 2016, including a black and red thumb drive seized from around Petitioner's at Tico Racer, (Id., Doc. No. 402 at 46, 58-59), and another thumb drive from the call center at Rohmoser, (Id., Doc. No. 402 at 83-84). Inspector Gonzalez's testimony established that the Tico Racer search was authorized by, and that the thumb drives were properly seized pursuant to, Letters Rogatory that were approved and executed by the Costa Rican Government. Petitioner's present contentions to the contrary are refuted by the record, are wholly unsupported by any evidence, and are rejected.

Petitioner's claim that evidence was improperly transported to the United States before he was extradited is facially insufficient. Petitioner fails to state what specific provision precluded the Government from transporting the evidence pursuant to the Letters Rogatory, or how the trial outcome would have been different had the evidence been maintained in Costa Rica up until his extradition, rather than being transported immediately to the United States by a postal inspector under secure conditions. See (Id., Doc. No. 402 at 54-56).

(c)     Petitioner contends that the Government introduced computer data at trial that was altered or adulterated, ensured that the computer expert was unavailable to testify, and thereby allowed unreliable information to be presented to the jury.

Inspector Gonzalez testified at trial that a computer expert in his office, Dan Dorman, produced actual duplicates of the digital evidence that was seized in Costa Rica so that the originals would not be damaged.  (Id., Doc. No. 402 at 61). Paper printouts of portions of these records were introduced at trial without objection.  (Id., Doc. No. 402 at 62-63).

Petitioner's allegations that the evidence introduced at trial was unreliable or inaccurate, that the Government purposefully ensured that Dorman would be unavailable to testify at trial, and

that it purposefully introduced inaccurate evidence, are wholly conclusory and unsupported. No basis for objection is apparent in the record. For instance, Herman Kankrini, who was intimately involved in the sweepstakes conspiracy, testified that the seized records reflected the fraud in which he and Petitioner were involved. <u>See</u>, <u>e.g.</u>, (<u>Id.</u>, Doc. No. 410 at 38, *et seq*.).

Moreover, Petitioner has failed to demonstrate prejudice in light of the other strong evidence of his guilt, including non-digital records such as Petitioner's handwritten notes in a spiral notebook tracking victims' losses, the testimony of Kankrini and Kustra who participated in the sweepstakes conspiracy with Petitioner, the testimony of Nyffeler that Petitioner purchased victim information from him for years, the seizure of over $200,000 in cash from Petitioner's home, and Petitioner's ownership of multiple cars and a luxury home despite his lack of a legitimate work record during the years preceding his arrest.

(d) Petitioner appears to argue that the Government's improper references to the "Pileggi call centers" at trial invaded the province of the jury by suggesting his guilt.

In reviewing a claim of prosecutorial misconduct, the court "review[s] the claim to determine whether the conduct so infected the trial with unfairness as to make the resulting conviction a denial of due process." <u>United States v. Scheetz</u>, 293 F.3d 175, 185 (4th Cir. 2002). Under this analysis, a defendant must first show that the prosecutor's remarks were improper and then establish that the remarks prejudicially affected his substantial rights thus depriving him of a fair trial. <u>Id.</u> Factors relevant to the second inquiry are: (1) the degree to which the remarks had a tendency to mislead the jury and prejudice the defendant; (2) "whether the remarks were isolated or extensive"; (3) the strength of the evidence against the defendant; (4) whether the comments were deliberately placed to divert the jury's attention; (5) whether the remarks were invited by

defense counsel; and (6) whether the district court gave curative instructions to the jury. Id. at 186 (citing United States v. Wilson, 135 F.3d 291, 299 (4th Cir. 1998)).

In the instant case, the Government referred to a certain group of evidence as "GP-CC," or the "Guiseppe Pileggi Call Center" to refer to items seized from a building in Rohmoser, Costa Rica, on May 16, 2006. (Crim. Case No. 3:06-cr-151-RJC, Doc. No. 402 at 80). The Government referred to items of evidence as "GC-PP" or "Pileggi call center" evidence at various points at trial without defense objection. See, e.g., (Id., Doc. No. 402 at 111, 132, 138, 141). However, on cross-examination, counsel asked Inspector Gonzalez why had referred to the Rohmoser call center as Petitioner's call center at least a dozen times, yet he had failed to actually see him there despite about eight trips to Costa Rica. (Id., Doc. No. 402 at 168-69). During his narrative, Petitioner raised the issue, stating: "One other thing that I noticed that the last three days, they have been referring to this call center in Rohmoser as the Pileggi call center. Okay. I have been hearing it ten, 20 times a day. It's getting to the point where even I'm believing it's the Pileggi call center. I really wish in the last three days they would have referred to it as the 'alleged Pileggi call center' or the call center that they are claiming belongs to me." (Id., Doc. No. 411 at 134-35).

The Government did not engage in misconduct by referring to one of the Costa Rican search sites as the "Pileggi call center." Numerous witnesses testified that Pileggi owned the call center in Rohmoser and actively managed his employees' fraudulent activities there. See (Id., Doc. No. 410 at 170-73) (Costa Rican fraud division chief, Minor Monge Camacho, testifying that he followed Petitioner to Rohmoser where he made a sudden stop in front of the call center, a person approached and they exchanged documents, and that person went back into the house and Petitioner continued his trip); (Id., Doc. No. 402 at 100-03, 123-24, 134-35) (Inspector Gonzalez testifying that fraud victim information and MAC addresses for VoIP phone boxes used in the

sweepstakes fraud corresponds to evidence seized from Petitioner's office at Tico Racer); (Id., Doc. No. 410 at 38-40, 74, 80) (Herman Kankrini testifying that he engaged in sweepstakes fraud with Petitioner for years, but that Petitioner avoided going to the last call center because he did not want to expose himself, and that he and Petitioner would split the call center proceeds at the end of each week, and testifying that "Mr. Pileggi's call center" was taking in between $200,000 and $300,000 per month in the months following up to his arrest). The Government did not exceed the bounds of propriety by referring to the Rohmoser location as the "Pileggi call center" because it was not misleading and was supported by the evidence and, even if it was improper, it did not prejudice Petitioner in light of the strong evidence of his guilt. See, e.g., United States v. Swain, 397 Fed. Appx. 893, 895–96 (4th Cir. 2010) (prosecutor's reference to defendant as a "felon" and "fugitive" were not improper because they were factually accurate and, even if improper, did not violate due process in light of the strong evidence of guilt).

(e)     Finally, Petitioner contends that the Government improperly commented on his silence by arguing that he asserted his rights to silence and to counsel upon his arrest and during his imprisonment in Costa Rica.

A criminal defendant's rights are violated when the prosecutor comments on the fact that a defendant has chosen to remain silent following his arrest and receipt of Miranda[4] warnings. See Brecht v. Abrahamson, 507 U.S. 619, 628 (1993); Doyle v. Ohio, 426 U.S. 610, 617–18 (1976). This rule "rests on 'the fundamental unfairness of implicitly assuring a suspect that his silence will not be used against him and then using his silence to impeach an explanation subsequently offered at trial.'" Wainwright v. Greenfield, 474 U.S. 284, 291 (1986) (quoting South Dakota v. Neville, 459 U.S. 553, 565 (1983)). The "implicit assurance" refers to the right-to-remain-silent component

---

[4] Miranda v. Arizona, 384 U.S. 436 (1966).

of <u>Miranda</u>, thus, the Constitution does not prohibit the use for impeachment purposes of a defendant's silence prior to arrest, <u>Jenkins v. Anderson</u>, 447 U.S. 231, 239 (1980), or after arrest if no <u>Miranda</u> warnings are given, <u>Fletcher v. Weir</u>, 455 U.S. 603, 606–607 (1982) (*per curiam*). <u>Brecht</u>, 507 U.S. at 628. Such silence is probative and does not rest on any implied assurance by law enforcement authorities that it will carry no penalty. <u>See</u> <u>Jenkins</u>, 447 U.S. at 239.

In the instant case, Petitioner testified that he had been excited to go to trial, get the matter cleared up, and go home, but was "shocked at all the evidence that has been tagged to [him]" for the first time at trial (<u>Id.</u>, Doc. No. 411 at 142). If he knew what was going to happen, he would have fast-tracked his extradition from Costa Rica and "would have helped out as much as [he] could." (<u>Id.</u>, Doc. No. 411 at 144). The Court ruled before Petitioner's second day of testimony that his claim that he only learned of the evidence at trial and sudden realization of his innocence left him "wide open" to cross-examination on the issue. (<u>Id.</u>, Doc. No. 412 at 9). The prosecutor accordingly asked Petitioner on cross-examination why he did not tell the consulate that he was innocent and being framed. (<u>Id.</u>, Doc. No. 412 at 55). Petitioner testified that he never asked to speak to investigators or attorneys because he was afraid for the safety of his children and wife. (<u>Id.</u>, Doc. No. 412 at 56). He was no longer afraid of professing his innocence at trial because whatever damage was going to be done had already been done by Kankrini and nobody was going to go after Petitioner's family at that point. (<u>Id.</u>, Doc. No. 412 at 57). He acknowledged that maybe he should have gone to the authorities about Kankrini's suspected fraud, but he had witnessed violence in Costa Rica which made him hesitant to approach the authorities. (<u>Id.</u>, Doc. No. 412 at 57).

Assuming the prosecutor's questions were improper, they did not have a substantial and injurious effect on the verdict in light of their brevity and the overwhelming evidence of

Petitioner's guilt. See, e.g., Brecht, 507 U.S. at 638 (affirming denial of habeas relief where state's improper uses of defendant's post-Miranda silence for impeachment purposes were infrequent and effectively cumulative, and the evidence of his guilty was weighty); Truesdale v. Moore, 142 F.3d 749, 756-57 (4th Cir. 1998) (affirming denial of habeas relief where police officer's testimony that the defendant stated while he was in custody, and before the victim's death was widely known, that he "hadn't killed any girl" and refused to respond when asked what girl he was referring to, did not have a substantial and injurious effect on the verdict where defendant's silence was not made known during any other part of trial and the jury heard ample additional evidence of his guilt, including defendant's partial confession). There is no reasonable probability that this issue affected the outcome of trial under these circumstances. See Smith v. Dixon, 14 F.3d 956 (4th Cir. 1994) (habeas petitioner was unable to demonstrate Strickland prejudice for the same reasons he could not demonstrate harmful error under Brecht); Pagliaccetti v. Kerestes, 581 Fed. Appx. 124, 136 (3d Cir. 2014) ("an error that is harmless under Brecht is also considered non-prejudicial under Strickland") (citing Whitney v. Horn, 280 F.3d 240 (3d Cir. 2002)).

(2)     Petitioner claims that the Court erred at trial by: (a) expressing bias against Petitioner; (b) advising defense counsel to make a Rule 29 motion; (c) refusing to appoint conflict counsel and requiring Petitioner to testify in the narrative; (d) allowing multiple conspiracies to be charged and tried in a single proceeding; (e) permitting recorded testimony to be presented along with a transcript did not match the recording; and (f) committing a multitude of due process errors that cumulatively deprived Petitioner of a fair trial.

(a)     Petitioner appears to argue that the Court improperly expressed bias against him by expressing vehement dislike for him due to his "despicable conduct." (Doc. No. 1 at 23).

This claim appears to refer to the original sentencing proceeding in which the Court referred to the heinous nature of the offenses. <u>See</u> (Crim. Case No. 3:06-151-RJC, Doc. No. 487 at 29). Assuming *arguendo* that the Court's comments exceeded the bounds of propriety, it is impossible for prejudice to have ensued because Petitioner was granted a resentencing before a different judge.

(b)     Petitioner complains that the Court improperly advised defense counsel to make a Rule 29 motion.

The record reflects that the Court asked counsel at the close of the Government's case whether he would be making any motions. At first, counsel said he did not intend to do so, but then chose to make a formal motion "for the record" without being heard. (<u>Id.</u>, Doc. No. 411 at 115). The motion was denied due to the sufficiency of the Government's evidence. (<u>Id.</u>, Doc. No. 411 at 115).

Petitioner fails to explain how the Court's action, which prompted counsel to make a Rule 29 motion, prejudiced him in any way. <u>See</u> generally <u>United States v. Akinsade</u>, 686 F.3d 248, 253 (4th Cir. 2012) (a defendant is unable to show prejudice if counsel's mis-advice is corrected by the court at a Rule 11 proceeding).

(c)     Petitioner contends that the Court improperly refused to appoint conflict counsel just before he took the stand, which required Petitioner to testify in the narrative.

A motion to withdraw or to substitute counsel presents a matter for the exercise of discretion by the trial court. <u>United States v. Mullen</u>, 32 F.3d 891, 895 (4th Cir. 1994). The court should consider the following three factors when presented with such a motion: (1) the timeliness of the motion; (2) the adequacy of the court's inquiry into the defendant's complaint about counsel; and (3) whether the conflict between attorney and client amounts to a breakdown in

communication so great that it prevents an adequate defense. <u>United States v. Smith</u>, 640 F.3d 580, 588 (4th Cir. 2011).

The record reflects that counsel advised Petitioner not to testify throughout trial. (<u>Id.</u>, Doc. No. 410 at 222-23) (defense counsel informing the Court that he had advised Petitioner not to take the stand because of what he would "open himself up to" by testifying). When Petitioner chose to disregard this advice, the following transpired:

> MR. BEECHLER: Your Honor, at this time I would move to withdraw from the case.
>
> THE COURT: What's the government's position?
>
> MR. LOEWENBERG: Well, at the end of the government's case-in-chief, it's an extreme burden. I understand the ethical reasons why Mr. Beechler makes that request, and I'm fully confident he expects the motion to be denied. And I think he is doing the appropriate thing to protect his good reputation in terms of the – we anticipate the defendant taking the stand and the ethical considerations why I think he has to make that motion.
>
> But I do think the Court is – should – needs to deny that motion at this stage in this case after the government has presented its evidence, brought witnesses, thousands of miles, tens of thousands of dollars to prepare and we would obviously oppose that.

(<u>Id.</u>, Doc. No. 411 at 117).

The Court acknowledged counsel's "ethical dilemma" and the "integrity" he displayed in moving to withdraw, but denied the motion to avoid additional victimization by having the witnesses testify again. <u>Id.</u> Counsel then asked that Petitioner be permitted to testify in the narrative:

> MR. BEECHLER: … I think for the record I need to state I have advised my client continuously throughout the trial, before, trial, that I believe he should not take the stand in this case. He's told me that he will exercise his right to testify in his own behalf.

> I would ask the Court at this time to permit him to testify in the narrative, and I do not intend to ask him anything whatsoever unless the Court would want me to ask a preliminary question to introduce myself.

(Id., Doc. No. 411 at 117-18).

The Court agreed to allow Petitioner to testify in the narrative and asked that counsel assist Petitioner, which counsel did. (Id., Doc. No. 411 at 122); see also (Id., Doc. No. 412 at 13) (the Court requesting that counsel also assist Petitioner with exhibits, which he did).

The Court did not err by denying counsel's motion to withdraw and permitting Petitioner to testify in the narrative. Although counsel did not explicitly state that his motion to withdraw was prompted by Petitioner's intent to present perjured testimony, the reason for the request was clear from the record. See generally United States v. Corporan–Cuevas, 35 F.3d 953, 956 (4th Cir. 1994) (district court did not err by denying motion to retain an additional lawyer that was untimely and a dilatory tactic); United States v. Omene, 143 F.3d 1167 (9th Cir. 1998) (district court did not err by requiring defendant to choose between not testifying and testifying in the narrative even though counsel did not reveal to the judge the basis for his conclusion that his client's testimony would be a fabrication, because the court made a specific factual finding after trial that the testimony was, in fact, perjurious). Counsel provided effective performance throughout trial, including after Petitioner's perjured testimony, and the only conflict was of Petitioner's making. See, e.g., United States v. Gardner, 417 F. Supp. 2d 703, 718–19 (D. Md. 2006) (denying counsel's motion to withdraw that was prompted by defendant's bizarre refusal to recognize the court's jurisdiction). The trial court did not abuse its discretion by denying the motion to withdraw under these circumstances.

(d) Petitioner contends that the Court erred by "conflat[ing] multiple, separate conspiracies into the same proceeding rather than having the government separately charge each crime…." (Doc. No. 1 at 23-24).

Rule 8(a) of the Federal Rules of Criminal Procedure provides that "[t]he indictment ... may charge a defendant in separate counts with [two] or more offenses if [1] the offenses charged ... are of the same or similar character, ... [2] are based on the same act or transaction, or [3] are connected with or constitute parts of a common scheme or plan." Courts have interpreted the latter two prongs of this rule flexibly, requiring that the joined offenses have a "logical relationship" to one another. United States v. Hirschfeld, 964 F.2d 318, 323 (4th Cir. 1992). Such a relationship exists when consideration of discrete counts against the defendant paints an incomplete picture of the defendant's criminal enterprise. United States v. Cardwell, 433 F.3d 378, 385 (4th Cir. 2005) (citing 1A Charles Alan Wright, *Federal Practice and Procedure* § 143 (3d ed. 1999) (noting that joinder is permitted where "the events pertaining to each [crime are] inextricably tied to the others")).

Petitioner was charged with a single count of conspiracy and twenty-two counts of wire fraud, all of which related to a single sweepstakes fraud scheme. His present argument that he was charged with multiple conspiracies in a single criminal case is factually unsound in that he was charged with only a single count of conspiracy. Further, he fails to explain any possible prejudice from being charged with a single count of conspiracy rather than multiple conspiracies in separate cases.

(e) Petitioner contends that the Court erred by permitting recorded testimony of victim Frank Pytel to be played at trial even though it is "undisputed" that the transcript of his prior

testimony which was distributed to the jury did not match the recording that was played at trial. (Doc. No. 1 at 24).

Whether to allow the use of transcripts to aid in the presentation of tape recorded evidence is within the district court's sound discretion. United States v. Long, 651 F.2d 239, 243 (4th Cir. 1981).

In the instant case, an elderly and ailing victim of the sweepstakes fraud, Frank Pytel, testified in court the same day the jury was empaneled. (Id., Doc. No. 411 at 79). The parties agreed that his testimony would be played at trial in lieu of requiring him to appear personally due to his deteriorating health. (Id.). Before playing the tape of Pytel's testimony for the jury, the Court informed the jury that a transcript would be provided "to aid the jury," however, the transcript "is not the testimony of Mr. Pytel's actual words or testimony" and therefore the "transcript is not evidence and [the jury] can only use it as a[n] aid." (Id., Doc. No. 411 at 81-82).

The Court did not abuse its discretion by providing transcripts to aid the jury, and any variations between the tape and the transcript could not have prejudiced Petitioner in light of the Court's cautionary instruction. See, e.g., United States v. Collazo, 732 F.2d 1200, 1203 (4th Cir. 1984) (court did not abuse its discretion by allowing the use of transcripts to aid in the presentation of tape-recorded evidence; the court's cautionary instructions cured any prejudice that might have resulted from discrepancies between the tape and transcript).

(f)     Finally, Petitioner contends that the Court committed a multitude of due process errors that cumulatively deprived him of a fair trial.

Pursuant to the cumulative error doctrine, the cumulative effect of two or more individually harmless errors has the potential to prejudice a defendant to the same extent as a single reversible error. United States v. Martinez, 277 F.3d 517, 532 (4th Cir. 2002). Generally, however, if a court

"determine[s] ... that none of [a defendant's] claims warrant reversal individually," it will "decline to employ the unusual remedy of reversing for cumulative error." United States v. Fields, 483 F.3d 313, 362 (5th Cir. 2007). To satisfy this requirement, such errors must "so fatally infect the trial that they violated the trial's fundamental fairness." United States v. Bell, 367 F.3d 452, 471 (5th Cir. 2004). When "none of [the] individual rulings work[ ] any cognizable harm, ... [i]t necessarily follows that the cumulative error doctrine finds no foothold." United States v. Sampson, 486 F.3d 13, 51 (2007). In the context of cumulative error with regards to ineffective assistance of counsel claims, such claims must be reviewed individually rather than collectively. Fisher v. Angelone, 163 F.3d 835, 852 (4th Cir. 1998).

Because Petitioner has failed to raise any meritorious claims of error, his claim of cumulative errors necessarily fails. Sampson, 486 F.3d at 51. Because no trial court errors occurred, neither trial nor appellate counsel can be deemed ineffective for failing to raise them and Petitioner's claims of cumulative error with regards to counsels' performance are likewise meritless. See United States v. Russell, 34 Fed.Appx. 927 (4th Cir. 2002) (observing that, in Fisher, the Fourth Circuit held that "it is not appropriate to consider the cumulative effect of attorney error when the individual claims of ineffective assistance do not violate the defendant's constitutional rights").

Based on the foregoing, Petitioner has failed to demonstrate that any prosecutorial misconduct or trial court error occurred. Therefore, neither trial nor appellate counsel could have been ineffective for failing to raise any of the foregoing claims at trial or on direct appeal. Ineffective assistance of counsel thus cannot constitute "cause" to excuse his procedural default of his claims of trial court error and prosecutorial misconduct, and he has also failed to demonstrate any actual prejudice.

Petitioner's claims of prosecutorial misconduct and trial court error are procedurally defaulted and no exception applies, and therefore, these claims are dismissed.

**B. Claims of Ineffective Assistance of Trial Counsel.**

Petitioner contends that counsel was ineffective with regards to the plea process, during trial preparation, and at trial. The Government argues that Petitioner's claims of ineffective assistance of trial counsel are conclusory and fail on the merits. For the following reasons, the Court agrees.

(1)     Petitioner claims that trial counsel provided ineffective assistance for failing to inform him regarding the Government's fifteen-year plea offer which led him to reject the plea, go to trial, and receive a twenty-five year sentence. He claims that counsel should have told him that the fifteen-year sentence would likely be reduced by three levels for acceptance of responsibility, and forty percent for substantial assistance. He also claims that counsel did not explain the "federal fraud doctrine." (Doc. No. 1 at 14). He seeks to accept the fifteen-year plea offer and argues that his profession of innocence at trial does not preclude him from challenging the voluntariness of the rejection of the plea offer.

As a preliminary matter, this claim is too vague and conclusory to support relief because Petitioner suggests, but fails to allege, that he would have accepted the fifteen-year plea offer but for counsel's alleged mis-advice. See generally United States v. Dyess, 730 F.3d 354 (4th Cir. 2013) (vague and conclusory allegations contained in a § 2255 petition may be disposed of without further investigation by the district court). Further, Petitioner's contention that he would have received a three-level reduction for acceptance of responsibility and a forty-percent reduction for substantial assistance had he accepted the fifteen-year plea offer, is speculative and unsupported by the record.

Moreover, Petitioner is unable to demonstrate prejudice because his trial testimony that he is innocent of the charges, along with his failure to clearly allege that he would have pled guilty but for counsel's mis-advice, make it impossible for him to demonstrate a reasonable probability that he would have accepted the plea had counsel performed effectively. A petitioner's repeated protestations of innocence throughout trial are relevant to the prejudice analysis in the plea context. See Smith v. United States, 348 F.3d 545, 552 (6th Cir.2003) (recognizing that "[p]rotestations of innocence throughout trial are properly a factor in the trial court's analysis, however they do not, by themselves, justify summary denial of relief without an evidentiary hearing") (citing Cullen v. United States, 194 F.3d 401, 404–07 (2d Cir.1999)); see also Griffin v. United States, 330 F.3d 733, 738 (6th Cir. 2003) (recognizing that a petitioner's repeated declarations of innocence throughout trial do not, by themselves, prove that the petitioner would not have accepted a guilty plea). In many cases, an evidentiary hearing in open court is required to determine whether or not counsel was ineffective for misadvising a petitioner about a plea offer. See generally United States v. Witherspoon, 231 F.3d 923, 926–27 (4th Cir. 2000); 28 U.S.C.A. § 2255(b); see, e.g., United States v. Ray, 547 Fed. Appx. 343 (4th Cir. 2013) (it was abuse of discretion for failing to conduct an evidentiary hearing on petitioner's claim of ineffective assistance with regards to a plea offer where "[t]he record as it is stands bare" and, other than petitioner's own assertions in his affidavit and pleadings, there was no evidence as to what transpired between petitioner and counsel during the plea negotiations, what advice counsel gave him about the plea offer at issue, and on what basis).

In the instant case, Petitioner testified under oath at trial that "I'm innocent of what they are accusing me of." (Id., Doc. No. 412 at 94). Petitioner states in his § 2255 petition that he wants

the opportunity to accept the 15-year plea, however, he fails to unequivocally allege that he would have accepted that plea at the time it was offered had counsel provided effective advice.

Under the specific circumstances present in this case, no evidentiary hearing is required because Petitioner's vague allegations, when combined with his trial testimony professing his innocence, leave no room for a reasonable probability that mis-advice with regards to the plea offer could have prejudiced him. See, e.g., Gallo-Vasquez v. United States, 402 F.3d 793, 798-99 (7th Cir. 2005) (rejecting petitioner's claim that counsel was ineffective for advising him to reject a 48-month plea offer where, even if counsel was ineffective, he could not show prejudice where he "went to trial, took the stand, and steadfastly professed his innocence. This record does not leave room for a reasonable probability that, but for counsel's advice, [petitioner] would have accepted a plea agreement."); James v. United States, 623 Fed.Appx. 973 (11th Cir. 2015) (district court did not abuse its discretion by denying claim of ineffective assistance without an evidentiary hearing because there was no reasonable probability that petitioner would have accepted a plea offer where he cited no evidence that he expressed a desire to plead guilty prior to his conviction and trial and even stated under oath during his sentencing hearing that he was innocent of the charges and the government's primary witness had lied to secure his conviction).

Therefore, in the particular circumstances presented in the instant case, the Court can conclude without an evidentiary hearing that there is no reasonable probability that Petitioner would have pled guilty but for counsel's alleged mis-advice, and therefore, the claim of ineffective assistance with regards to the plea offer is meritless.

(2)     Petitioner claims that counsel was ineffective during trial preparation by failing to investigate the facts and law related to admissibility of the thumb drive which "quite possibly" was not Petitioner's. (Doc. No. 1 at 16).

This claim is conclusively refuted by the record. Inspector Gonzalez testified that the Costa Rican "Acta" indicates that a red and black thumb drive or flash drive that was seized from around Petitioner's neck at Tico Racer when he was arrested on May 16, 2006. (Id., Doc. No. 402 at 58-59). Herman Kankrini testified that the drive introduced into evidence at trial was the one he saw at Tico Racer that belongs to Petitioner. (Id., Doc. No. 410 at 88). Petitioner would wear the thumb drive around his neck and Kankrini did not think anyone else had access to it. (Id., Doc. No. 410 at 105). Agent Carillo, who personally arrested Petitioner, testified that he found the thumb drive around Petitioner's neck and seized it when he arrested Petitioner. (Id., Doc. No. 410 at 164-65). Petitioner even acknowledged during his trial testimony that "[i]t was my thumb drive." (Id., Doc. No. 411 at 128). Petitioner's present self-serving and completely unsupported claim that the thumb drive might not be his, is rejected. See Blackledge v. Allison, 431 U.S. 63, 74 (1977) ("Solemn declarations in open court carry a strong presumption of verity. The subsequent presentation of conclusory allegations unsupported by specifics is subject to summary dismissal, as are contentions that in the face of the record are wholly incredible."). Counsel cannot be deemed ineffective for failing to investigate this frivolous claim.

(3)     Petitioner contends that counsel was ineffective with regards to a conflict of interest by accepting a $30,000 retainer and proceeding with the representation even though he received a letter from Petitioner on the same day he was hired, which he interpreted as a confession, stopping trial preparation when the Government attempted to seize the $30,000 retainer and forbade him from accepting any more money from Petitioner, failing to tell Petitioner he could get substitute counsel, continuing on the case after Petitioner chose to go to trial, which created an actual conflict of interest, and failing to obtain a waiver from Petitioner or notify the Court of his withdrawal.

To establish ineffective assistance of counsel based on a conflict of interest, a defendant who raised no objection at trial must demonstrate that (1) counsel operated under an "actual conflict of interest;" and (2) this conflict "adversely affected his lawyer's performance." United States v. Dehlinger, 740 F.3d 315, 322 (4th Cir. 2014) (quoting Cuyler v. Sullivan, 446 U.S. 335, 348 (1980)). If the petitioner satisfies this showing, "prejudice is presumed and [he] need not demonstrate a reasonable probability that, but for counsel's conflicted representation, the outcome of the proceeding would have been different." Woodfolk v. Maynard, 857 F.3d 531, 553 (4th Cir. 2017) (citing United States v. Nicholson, 611 F.3d 191, 195 (4th Cir. 2010)). An actual conflict exists when a petitioner shows that his counsel "actively represented conflicting interests." Sullivan, 446 U.S. at 350. "A defendant has established an adverse effect if he proves that his attorney took action on behalf of one client that was necessarily adverse to the defense of another or failed to take action on behalf of one because it would adversely affect another." Mickens v. Taylor, 240 F.3d 348, 360 (4th Cir. 2001) (en banc). A showing of adverse effect requires the petitioner to: (1) "identify a plausible alternative defense strategy or tactic that his defense counsel might have pursued;" (2) show that this strategy "was objectively reasonable under the facts of the case known to the attorney at the time," and (3) show "that the defense counsel's failure to pursue that strategy or tactic was linked to the actual conflict." United States v. Dehlinger, 740 F.3d 315, 322 (4th Cir. 2014) (quoting Mickens, 240 F.3d at 361). Because an actual conflict of interest requires not only a theoretically divided loyalty, but also a conflict that actually affected counsel's performance, the actual conflict and adverse effect inquiries are often intertwined. Jones v. Polk, 401 F.3d 257, 267 (4th Cir. 2005).

Petitioner's claim that counsel was ineffective with regards to an actual conflict fails for several reasons. First, an actual conflict of interest does not appear just because counsel believes

his criminal client is guilty or intends to present what counsel believes to be perjured testimony. As the United States Supreme Court has explained, a "conflict" imposed on an attorney by the client's proposal to commit the crime of fabricating testimony "is not remotely the kind of conflict of interests dealt with in <u>Cuyler v. Sullivan</u>." <u>Nix v. Whiteside</u>, 475 U.S. 157, 175 (1986). That is, "[i]f a 'conflict' between a client's proposal and counsel's ethical obligation gives rise to a presumption that counsel's assistance was prejudicially ineffective, every guilty criminal's conviction would be suspect if the defendant had sought to obtain an acquittal by illegal means." <u>Id.</u>

Second, even if an actual conflict did arise at some point during the representation, Petitioner's claim fails because he has not identified a plausible alternative strategy that defense counsel might have pursued, show that the strategy was objectively reasonable, or show that counsel's failure to pursue it was linked to the actual conflict. Petitioner's alternative strategy appears to be that he could have more effectively presented perjured testimony at trial had his testimony been directed by a lawyer who was ignorant of his guilt. This is not an ethically viable position and, moreover, his supposition that his trial outcome would have been different had his testimony been directed by a lawyer is wholly speculative. <u>See</u> <u>generally</u> <u>Nix</u>, 475 U.S. at 173 (the "right to counsel includes no right to have a lawyer who will cooperate with planned perjury.").

The record reveals that counsel provided effective and zealous representation throughout the trial. When Petitioner decided to take the stand, counsel attempted to dissuade him and, when counsel's efforts failed, counsel unsuccessfully moved to withdraw then received permission for Petitioner to testify in the narrative. <u>See</u> Claim A(2)(c), *supra*. Counsel's actions were in accordance with his ethical obligations to Petitioner as well as to the Court. <u>See</u> <u>Nix</u>, 475 U.S. at

157 (seeking to withdraw is an appropriate response to a criminal defendant's intention to commit perjury).

Moreover, Petitioner's contentions that he was unprepared to testify and that he wanted counsel to withdraw, are belied by the record. He took the stand with prepared notes, methodically addressed points that the Government had made in its case-in-chief, and had the assistance of counsel to help present exhibits. At the close of trial, he elected for counsel to speak on his behalf in closing argument rather than splitting the time with counsel, and chose for counsel to represent him at the sentencing hearing. (Id., Doc. No. 411 at 122); (Id., Doc. No. 412 at 94, 99-100); (Id., Doc. No. 487 at 5). Taken together, the record reveals that counsel performed effectively and appropriately under the difficult circumstances with which he was presented. No ineffective assistance of counsel occurred with regards to the alleged conflict of interest and this claim will be denied.

(4)     Petitioner claims that counsel was ineffective with regards to the following evidentiary matters: (a) the Government's failure to demonstrate a chain of custody problem with regards to the thumb drive; and (b) the admissibility of evidence seized in violation of the Extradition Treaty and discovery laws.

(a)     Petitioner contends that the chain of custody for the thumb drive seized from him was insufficient, and that it was actually seized from around his neck around lunchtime rather than at 8:30 AM as testified by Costa Rican agents.

The Government presented evidence at trial that "a red and black thumb drive or flash drive that was seized from Mr. Guiseppe Pileggi at Tico Racer," was recovered "[o]n Mr. Pileggi … [a]round his neck," and was taken from him upon his arrest at around 8:30 AM on May 16, 2006. (Id., Doc. No. 402 at 59). It was among the items sealed, locked, flown to the United States, and

entered into the evidence locker by a United States Postal Inspector, and remained sealed until trial. (Id., Doc. No. 402 at 58-60). Petitioner testified at trial that he did not recall which agent arrested him and disputed the timing and location of the arrest; *i.e.*, on the sidewalk outside the Tico Racer store at around 8:30 AM according to the agent, or inside the Tico Racer store at 10:30 AM according to Petitioner. See (Id., Doc. No. 411 at 126-28). He admitted that the thumb drive was his but suggested someone at the store who had access to the thumb drive, such as Kankrini or the Government, had planted evidence on it or otherwise tampered with it. (Id., Doc. No. 411 at 128).

Counsel was not ineffective for failing to object to the thumb drive's chain of custody because the Government adequately addressed the matter. Moreover, Petitioner admitted ownership of the thumb drive at trial and placed the issue of tampering before the jury for consideration. Petitioner has failed to explain how there is a reasonable probability of a different trial outcome had counsel raised these issues in light of his own admission that the thumb drive was his, the fact that he raised the issue of tampering for the jury, and in light of the strong evidence of his guilt including the testimony of three co-conspirators.

(b)     Petitioner's claim that evidence was improperly seized in Costa Rica and transported to the United States prior to his extradition is meritless for the reasons set forth in Claim A(1)(b), *supra*, and accordingly counsel was not ineffective for failing to object to its introduction.

(5)     Petitioner claims that counsel was ineffective for failing to object to a fatal variance in that the Government failed to prove the 22 specific instances of wire fraud for which he was indicted.

The Fifth Amendment to the United States Constitution provides for a right to indictment by grand jury. U.S. Const. Amend. V; United States v. Floresca, 38 F.3d 706, 709 (4th Cir. 1994) (*en banc*). This right is violated when the proof offered at trial permits a jury to convict a defendant for a different offense than that for which he was indicted. See United States v. Fletcher, 74 F.3d 49, 53 (4th Cir. 1996)("When a defendant is convicted of charges not included in the indictment, an amendment has occurred which is *per se* reversible error."). Not all variances between an indictment and the proof offered at trial, however, constitute a constructive amendment of an indictment. A variance in the indictment violates a defendant's rights only if it prejudices him. Id. This occurs only when the variance either "surpris[es the defendant] at trial and hinder[s] the preparation of his defense, or ... expos[es] him to the danger of a second prosecution for the same offense." Id. (citations omitted). However, "[a]s long as the proof at trial does not add anything new or constitute a broadening of the charges, then minor discrepancies between the Government's charges and the facts proved at trial generally are permissible." Id.; see also Floresca, 38 F.3d at 709-10 ("Once a reviewing court determines that the facts incorrectly noted in the indictment do not concern an issue that is essential or material to a finding of guilt, the focus is properly upon whether the indictment provided the defendant with adequate notice to defend the charges against him.") (footnote omitted). Thus, as long as the indictment provides the defendant with adequate notice of the charges against him and is sufficient to allow the defendant to plead it as a bar to subsequent prosecutions, a variance in proof at trial will not prejudice the defendant. See United States v. Miller, 471 U.S. 130, 134-35 (1985); Fletcher, 74 F.3d at 53. These notice-related concerns are not implicated when the alleged variance does not affect an essential element of the offense. See Floresca, 38 F.3d at 709-10; see, e.g., United States v. Redd, 161 F.3d 793, 795–96

(4th Cir. 1998) (no fatal variance where the indictment charged the defendant with possessing a black revolver whereas the evidence at trial showed it was silver).

In the instant case, the indictment alleged that each of the wires was received in San Jose, Costa Rica, and involved a specific victim, date, and amount.[5]

The Government introduced at trial voluminous paper and digital records seized from the call centers and Petitioner's Tico Racer office in Costa Rica, which documented the fraud carried out on the victims set forth in the indictment as well as hundreds of other victims who were not included in the indictment. See (Id., Doc. No. 402 at 90-99). Inspector Gonzalez testified that the exhibits introduced at trial included the real individuals identified in the indictment, all of whom lost money in the sweepstakes fraud. (Id., Doc. No. 402 at 98-99). Defense counsel objected when

---

[5]

Count 2: W&ND, Gackle, N.D., 7/15/05, $1,210
Count 3: W&ND, Gackle, N.D., 7/18/05, $2,114
Count 4: W&ND, Gackle, N.D., 8/23/05, $2,999
Count 5: DK, Strasburg, N.D., 8/29/05, $2,905
Count 6: DK, Strasburg, N.D., 9/20/05, $2,114
Count 7: DK, Strasburg, N.D. 9/20/05, $1,516
Count 8: JH, Detroit Lakes, MN, 10/11/05, $1,789
Count 9: AF, Ketchum, ID, 10/26/05, $1,208
Count 10: RL, Pacifica, CA, 11/16/05, $1,068
Count 11: MM, W. Palm Beach, FL, 11/22/05, $1,208
Count 12: PJ, Arlington, WA, 11/22/05, $1,000
Count 13: JD, Martinsville, OH, 12/6/05, $1,069
Count 14: MB, Terre Haute, IN, 12/7/05, $1,208
Count 15: CW, Huntersville, NC, 12/8/05, $1,208
Count 16: ED, Naples, FL 12/12/05, $2,375
Count 17: LS, Sun City, AZ, 12/13/05, $1,000
Count 19: LH, McDonald, TN, 12/13/05, $1,233
Count 20: CF, Salt Lake City, UT, 12/15/05, $1,068
Count 21: DS, San Antonio, TX, 12/15/05, $1,068
Count 22: DC, Fort Wayne, IN, 12/16/05, $1,068
Count 23: RG, San Angelo, TX 12/16/05, $1,208

(Id., Doc. No. 113 at 15-16). Count 18 was dismissed before Petitioner was sentenced so it is not included in this discussion.

several of the witnesses who were not charged in the indictment testified at trial on the grounds that the evidence was cumulative and prejudicial. (Id., Doc. No. 402 at 5, 106, 139, 181, 190); (Id., Doc. No. 411 at 20, 45, 68, 85). The Court correctly overruled the objection because these witnesses' testimony was relevant to Petitioner's participation in the wire fraud conspiracy and the relevance was not outweighed by the danger of unfair prejudice. (Id., Doc. No. 410 at 140); see Fed. R. Ev. 401, 403, 404(b); see, e.g., United States v. Hodge, 354 F.3d 305 (4th Cir. 2004) (evidence of uncharged drug transactions was relevant and necessary in prosecution for possession of cocaine with intent to distribute to show the existence of a continuing narcotics business and, therefore, defendant's knowledge of the drug trade and intent to distribute cocaine found in his vehicle); United States v. Cassidy, 48 Fed. Appx. 428 (4th Cir. 2002) (testimony by former investors concerning their dealings with defendant prior to the offense for which he was being tried was relevant to show that defendant's claim of vast hidden assets, which supposedly served as collateral for his withdrawal of investors' funds from his accounts, were false and was therefore admissible under Rule 404(b) to show knowledge and intent); United States v. Coward, 669 F.2d 180 (4th Cir. 1982) (admission into evidence of over 800 prescriptions for controlled drugs written by defendant and another individual during the time of the alleged conspiracy were relevant to prove defendant's knowledge and intent, and prejudicial value of this evidence did not outweigh its probative value).

Counsel was not ineffective for failing to object to a variance between the indictment and evidence because no such variance occurred. The Court found that the Government proved the individual counts of wire fraud and Petitioner has failed to come forth with any evidence to the contrary. See generally Lockhart v. Fretwell, 506 U.S. 364, 374 (1993) (a defendant is not prejudiced if his counsel fails to make an objection that is "wholly meritless under current

governing law"). Moreover, reasonable counsel could have concluded, in light of the already-overwhelming evidence of Petitioner's guilt, that it would have been counterproductive to insist that the Government produce additional evidence to support each of the specific counts of wire fraud. See generally Burger v. Kemp, 483 U.S. 776 (1987) (concluding that failure to introduce character evidence was effective performance because witnesses could have been subjected to harmful cross-examination or invited other damaging evidence). Therefore, this claim is meritless and will be denied.

(6)     Petitioner contends that counsel was ineffective for failing to make a Rule 29 motion without the Court's intervention and failing to present a sufficient Rule 29 motion challenging the variance in proof and sufficiency of the evidence with regards to the 22 counts of wire fraud.

Counsel's Rule 29 motion was only deficient with regards to Count 18, for which the Government was unable to locate documentary evidence supporting Inspector Gonzalez's testimony. (Id., Doc. No. 487 at 3). However, he was not prejudiced by this lapse because the Government moved to dismiss that count before Petitioner was sentenced. (Id., Doc. No. 487 at 3). Therefore, Petitioner's claim of ineffective assistance of trial counsel with regards to the Rule 29 motion will be denied.

### C.  INEFFECTIVE ASSISTANCE OF APPELLATE COUNSEL

(1)     Petitioner claims that counsel was ineffective for selecting the appellate issues without the benefit of the entire record, and thus failed to explore the possibility of jury instruction errors which are often meritorious.

This claim is too vague and conclusory to support relief. Petitioner's contention that there may have been jury instruction errors and, if they existed, they might have succeeded on appeal,

is wholly unsupported by any evidence and speculative. Therefore, summary dismissal of this claim is warranted. <u>See</u> <u>generally</u> <u>Raines</u>, 423 F.2d at 529.

(2)     Petitioner claims that counsel was ineffective for raising only a sentencing argument on appeal to the exclusion claims of: fatal variance; deprivation of counsel on Petitioner's direct examination; admitting testimony from 22 witnesses as well as an inaudible video, that were unrelated to the indictment; the Court's "in-trial practice advice" to defense counsel; and introduction of expert-derived evidence without requiring the expert to be subjected to confrontation.

Appellate counsel cannot be deemed ineffective for failing to raise any of the claims that Petitioner has identified because they are meritless for the reasons previously discussed in this Order. <u>See</u> Claims B(5), A(2)(c),  B(5), A(2)(b), B(6), A(1)(c).

Therefore, Petitioner's claims of ineffective assistance of appellate counsel will be denied.

V.      CONCLUSION

For the foregoing reasons, the Court denies and dismisses Petitioner's § 2255 petition.

IT IS, THEREFORE, ORDERED that:

1.      Petitioner's Motion to Vacate, Set Aside or Correct Sentence under 28 U.S.C. § 2255, (Doc. No. 1), is DENIED and DISMISSED.

2.      IT IS FURTHER ORDERED that pursuant to Rule 11(a) of the Rules Governing Section 2254 and Section 2255 Cases, this Court declines to issue a certificate of appealability.  <u>See</u> 28 U.S.C. § 2253(c)(2); <u>Miller-El v. Cockrell</u>, 537 U.S. 322, 338 (2003) (in order to satisfy § 2253(c), a petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong); <u>Slack v. McDaniel</u>, 529 U.S. 473, 484 (2000) (when relief is

denied on procedural grounds, a petitioner must establish both that the dispositive procedural ruling is debatable and that the petition states a debatable claim of the denial of a constitutional right).

Signed: September 1, 2017

Robert J. Conrad, Jr.
United States District Judge